**Carl Wesley THOMAS, Plaintiff,**

v.

**Paul A. BIBLE; Jerry Lockhart; Barton Jacka; the present members of the Nevada Gaming Commission in their official capacity, being John O'Reilly, Robert Peccole, Robert Lewis, Ken Gragson, Betty Vogler; and the present members of the Nevada Gaming Control Board in their official capacity, being Jerry Cunningham, Michael Rumbolz, and Dennis Amerine, Defendants.**

**No. CV S-87-526 RDF.**

United States District Court,
D. Nevada.

Aug. 10, 1988.

Wright, Shinehouse & Stewart by Richard Wright and Bruce Judd, Las Vegas, Nev., for plaintiff.

Brian McKay, Atty. Gen. by Gloria Stendardi, Deputy Atty. Gen., Carson City, Nev., for defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROGER D. FOLEY, Senior District Judge.

INTRODUCTION:

The state of Nevada has enacted the Nevada Gaming Control Act ("Act"); a comprehensive regulatory scheme that provides for the strict regulation of its gaming industry. Nev.Rev.Stat. § 463.010 et seq. (1987). The express public policy of the state concerning licensed gaming provides, in pertinent part, that the continued growth and success of licensed gaming is dependent upon public confidence and trust; that licensed gaming is conducted honestly and that licensed gaming is free from criminal and corruptive elements. Public confidence and trust can only be maintained by strict regulation of persons, locations, practices, associations and activities related to the operation of licensed gaming establishments. Nev.Rev.Stat. § 463.0129(1) (1987).[1]

---

**1.** *463.0129 Public policy of state concerning gaming; license or approval revocable privilege.*

1. The legislature hereby finds, and declares to be the public policy of this state, that:

(a) The gaming industry is vitally important to the economy of the state and the general welfare of the inhabitants.

(b) The continued growth and success of gaming is dependent upon public confidence and trust that licensed gaming is conducted honestly and competitively, that the rights of the creditors of licensees are protected and that gaming is free from criminal and corruptive ·elements. ·

(c) Public confidence and trust can only be maintained by strict regulation of all persons, locations, practices, associations and activities related to the operation of licensed gaming establishments and the manufacture or distribution of gambling devices and equipment.

(d) All establishments where gaming is conducted and where gambling devices are operated, the manufacturers, sellers and distributors of certain gambling devices and equipment must therefore be licensed, controlled and assisted to protect the public health, safety, morals, good order and general welfare of the inhabitants of the state, to foster the stability and

The Nevada Legislature has specifically declared that the exclusion of certain persons from licensed gaming establishments which conduct pari-mutuel wagering or operate any race book, sports pool, or games, other than slot machines only, is necessary to effectuate the policies of the Act and to maintain effectively the regulation of licensed gaming. Nev.Rev.Stat. § 463.151(1) (1987). Accordingly, the Legislature empowered the Nevada Gaming Commission ("Commission"), to provide for an Exclusion List ("List"): a list of persons who are excluded from Nevada's casinos. Nev.Rev.Stat. §§ 463.151–.155 (1987).

The Nevada Gaming Control Board ("Board"), is a three-member, full-time administrative agency that serves as the investigative and prosecutorial body and nominates candidates for the List. Nev. Rev.Stat. §§ 463.030–.110 (1987). The Commission is a five-member, part-time lay administrative agency that functions in a quasi-judicial capacity, acting as judge and making the final decision whether a candidate, nominated by the Board, should be included on the List. Nev.Rev.Stat. §§ 463.022–.029 (1987); see Trans–Sterling, Inc. v. Bible, 804 F.2d 525, 527 n. 1 (9th Cir.1986).[2]

BACKGROUND:

Prior to 1979, plaintiff Carl Wesley Thomas ("Thomas"), held gaming licenses for and possessed an ownership interest in two gaming properties located in Las Vegas, Nevada: Bingo Palace Casino, Inc. and Slots–A–Fun. In 1979, transcripts of certain FBI wiretaps concerning organized crime skimming operations in Las Vegas were made public and became known as the "Kansas City tapes." In one of the tapes, the "Marlo" tape,[3] plaintiff was overheard instructing several organized crime figures on recommended ways of skimming from Nevada's casinos. see United States v. DeLuna, 763 F.2d 897, 915 (8th Cir.) cert. denied, 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985).

On June 25, 1979, upon disclosure of the "Marlo" tape, the Board moved to revoke Thomas' gaming licenses and on June 29, 1979, the Board initiated the process for nominating Thomas as a candidate for the List.[4] On June 29, 1979, the Commission received the Board's order to place Thomas' name on the List. On July 27, 1979, Thomas filed a request for a hearing on the exclusionary matter which was set by the Commission for September 7, 1979.

On August 23, 1979, a hearing was held before the Commission regarding Thomas' gaming licenses. The disciplinary action was settled when the Commission accepted the stipulation of the Board and plaintiff to a revocation of his licenses and a payment of a fine. On August 27, 1979, the Board requested that the exclusionary hearing be continued because, at that time, the transcripts of the federal wiretaps, the "Kansas City tapes," were unavailable due to a motion to suppress in the Kansas City federal criminal proceeding.

success of gaming and to preserve the competitive economy and policies of free competition of the State of Nevada.

2. No applicant for a license or other affirmative commission approval has any right to a license or the granting of the approval sought. Any license issued or other commission approval granted pursuant to the provisions of this chapter or chapter 464 of NRS is a revocable privilege, and no holder acquires any vested right therein or thereunder. Nev.Rev.Stat. § 463.0129 (1987).

2. "Under Nevada law, the Board acts as prosecutor and grand jury, investigating and bringing complaints for alleged violations. The Commission acts as judge and jury, hearing complaints and responses and making the final decision on violations and punishment." Trans–Sterling, Inc., 804 F.2d at 527, n. 1.

3. The court notes the discrepancy between the parties as to the spelling of the "Marlo" (Plaintiff's Complaint (No. 1) p. 4), and the "Marlow" (Defendants' Motion to Dismiss (No. 16) p. 6), tape. (The "Marlo" tape as discussed in United States v. DeLuna, 763 F.2d 897, 920 (8th Cir.), cert. denied 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985)).

4. For the purposes of this order, the word "process" means the Board's role of investigating and nominating a candidate for inclusion on the List. The word "hearing" means the actual exclusionary hearing or proceeding: when the Board acts as prosecutor and the Commission acts in a quasi-judicial capacity and makes the final decision whether a candidate, nominated by the Board, should be included on the List.

On August 29, 1979, because of the unavailability of the "Kansas City tapes," the Board withdrew the June 29, 1979 order nominating Thomas for the List. The withdrawal was without prejudice. The Commission vacated the hearing set for September 7, 1979.

Subsequently, on October 10, 1983, Thomas was convicted on ten counts of skimming-related felonies involving the Tropicana Hotel and Casino. *United States v. DeLuna, et al.*, CR–81–00107 01/11 CR–W–8 (U.S.Dist.Ct.W.Dist. of Mo.) (the "Tropicana" case as reflected in the "Marlo" tape).[5] *see United States v. DeLuna,* 763 F.2d 897 (8th Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985). On September 30, 1983, the federal government also indicted plaintiff on other skimming charges involving the Stardust Hotel and Casino. *United States v. DeLuna, et al.,* CR–83–00124 01/15 CR–W–8 (U.S.Dist.Ct.W.Dist. of Mo.) (the "Argent case"). *see United States v. Thomas,* 759 F.2d 659 (8th Cir.1985).

Ultimately, Thomas was immunized and testified in the Argent case. After he testified, his original fifteen year prison sentence in the Tropicana case was reduced to two years and he was then soon paroled.

In 1985, the Board then resumed the process of nominating plaintiff for the List based upon his Tropicana case conviction and his skimming career as disclosed in his immunized testimony in the Argent case. On January 22, 1987, at the conclusion of the second hearing before the Commission, the Commission concluded that plaintiff's presence in a gaming establishment would pose a threat to the interests of Nevada and to licensed gaming and voted unanimously to place Thomas on the List. Nev. Rev.Stat. § 463.151 (1987).

On February 19, 1987, the Commission filed and served the final written order of exclusion containing findings of fact and conclusions of law and stayed the implementation of its exclusion order pending plaintiff's right to seek state judicial review pursuant to NRS 463.312. Later, on June 18, 1987, the Commission extended the stay so as to allow plaintiff to file this action in federal court.

PROCEDURAL HISTORY:

On July 10, 1987, Plaintiff filed a complaint against former members of the Commission, Paul A. Bible ("Bible"), and Jerry Lockhart, and former member of the Board, Barton Jacka ("Jacka"), and the present members of the Commission and the Board in their official capacities ("defendants").

The court has original jurisdiction over the matter based on 28 U.S.C. § 1343. *see Louis v. Sup. Ct. of Nevada,* 490 F.Supp. 1174 (D.Nev.1980).[6] Plaintiff's complaint includes the following four causes of action:

1) 42 U.S.C. § 1983 to redress alleged "deprivation, under color of state law, of plaintiff's rights and privileges secured by the due process clause of the Fourteenth Amendment" (Plaintiff's Complaint (No. 1) p. 1);

2) 42 U.S.C. § 1985(2) to redress injuries resulting from an alleged conspiracy to procure state administrative action against plaintiff based upon improper evidence and improper procedures with the intent to "maliciously deprive plaintiff of his property rights and the equal protection of the laws", *Id.* at 2;

3) declaratory relief from placement on the List, *Id.* at 13–4; and

4) permanent injunctive relief to prevent the Commission from again attempting to place Thomas' on the List. *Id.* at 14–5.

Further, plaintiff includes the following allegations: the exclusionary hearings before the Commission violated plaintiff's right to procedural due process because the

---

**5.** The court notes the discrepancy between the parties as to case no. CR–81–00107 01/11 CR–W–8 (Plaintiff's Complaint (No. 1) p. 4) and CR–81–00107 01/11 CR–W–3 (Defendants' Motion to Dismiss (No. 16) p. 7).

**6.** Jurisdiction invoked pursuant to 28 U.S.C. § 1343 grants federal district courts original jurisdiction to entertain civil actions to redress the deprivation, under color of state law, of any right secured by the United States Constitution. *Louis,* 490 F.Supp. at 1177.

Commission did not provide plaintiff with the opportunity to be heard (Plaintiff's Opposition to Defendants' Motion to Dismiss (No. 20) pp. 13–14); plaintiff invoked the Fifth Amendment privilege in response to inquiries by an agent of the Board because he would have incriminated himself, *Id.* at 12–13; and the Board violated plaintiff's right to equal protection because it had no rational basis for narrowing the possible candidates in such a way as to include plaintiff on the List. *Id.* at 16.

On September 28, 1987, defendants filed a motion to dismiss. On February 29, 1988, the court ordered that the motion to dismiss be converted into a motion for summary judgment, giving the parties notice of the changed status and reasonable opportunity to present "all material made pertinent" to such a motion. Fed.R.Civ.P. 12(b). On April 22, 1988, the court heard oral argument from both parties and took the matter under submission.

Having permitted the parties to file additional papers, having heard oral argument from both parties, having reviewed all papers submitted and having considered the evidence in the light most favorable to the plaintiff, the court orders that defendants' motion for summary judgment be GRANTED.

The court takes judicial notice that the Nevada Supreme Court in *Spilotro v. State ex rel. Gaming Comm'n,* 99 Nev. 187, 661 P.2d 467 (1983), upheld the statutes authorizing the List as constitutionally valid on their face: Nev.Rev.Stat. §§ 463.151–.155 (1987) and NGC Reg. 28.[7] The issue before the court, in the instant action, is whether these exclusionary statutes were constitutional in their application to plaintiff Thomas.

7. "In sum, we hold NRS 463.151 through NRS 463.155 and Gaming Commission Regulation 28 as constitutional on their face and as applied to appellant. However, we reverse and direct the district court to remand the case to the Gaming Commission for a statement of the facts on which it relied in placing appellant on the exclusionary list." *Spilotro,* 99 Nev. at 195, 661 P.2d at 472.

## SUMMARY JUDGMENT STANDARD:

In *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court explained that "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552, 91 L.Ed.2d at 273.[8]

Further, in *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court on a Rule 56 motion, considered separately the issues of materiality and genuineness and concluded that the substantive law determines which facts are material. Once it is determined that a material fact is present, the court must decide whether that material fact is "genuine." The Court noted that the "genuine issue" summary judgment standard is very close to the "reasonable jury" directed verdict standard, and explained that a summary judgment cannot be granted if the material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 247–48, 106 S.Ct. at 2509–10, 91 L.Ed.2d at 211–12; *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53, 91 L.Ed.2d at 273–74; *see also Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 624, 64 S.Ct. 724, 727, 88 L.Ed. 967 (1944).

"Just as the convincing clarity requirement is relevant in ruling on a motion for directed verdict, it is relevant in ruling on a motion for summary judgment." *Liberty Lobby,* 477 U.S. at 254, 106 S.Ct. at 2513, 91 L.Ed.2d at 215. "Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through

8. "Of course, a party seeking summary judgment always bears the initial responsibility of informing the distict court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553, 91 L.Ed.2d at 274.

the prism of the substantive evidentiary burden." *Id.*

■ Thomas cites *Mabey v. Reagan*, 537 F.2d 1036 (1976), as support for his position that summary disposition is generally inapposite for constitutional questions.[9] The court recognizes the rule of thumb that summary judgment in constitutional cases alleging conspiracy requires caution, but does not believe that there exists a hard-and-fast rule.

In *Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), the district court granted a summary judgment motion which had been supported by affidavits of the alleged conspirators. The district court held that defendants were independent actors exercising good business judgment and were simply responding to market and regulatory changes rather than conspiring against plaintiff. The Supreme Court reversed explaining that although a jury may find for defendant, "[W]e cannot say on this record that it is quite clear what the truth is," because the information is in the hands of the conspirators. *Id.* at 472–73, 82 S.Ct. at 491.

However, in *First Nat'l Bank of Arizona v. Cities Service Co. ("Cities Services")*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), in a case factually similar to *Poller*, the Court affirmed the district court grant of summary judgment noting that *Poller* had been properly applied.

The Supreme Court explained that merely alleging that a conspiracy exists is not sufficient to avoid summary judgment. Under Rule 56(e) the plaintiff, nonmovant, has the burden of producing evidence of the alleged conspiracy only after the defendant, movant, shows conclusively that the facts upon which plaintiff's allegations are based are not susceptible of the interpretation plaintiff seeks to give them.

*Cities Services*, 391 U.S. at 288, 88 S.Ct. at 1592.

After the movant has properly supported its summary judgment motion, the nonmovant must produce sufficient evidence to require a "jury or judge to resolve the parties' differing versions of the truth at trial," *Id.* at 289, 88 S.Ct. at 1592, and although the nonmovant need not show that the issue will be resolved in its favor, *Id.* at 288, 88 S.Ct. at 1592, the pleadings, "coupled with the hope that something can be developed at trial in the way of evidence to support those allegations," are not sufficient to withstand summary judgment. *Id.* at 290, 88 S.Ct. at 1593.

Rule 56(e) makes it clear that an adverse party may not rest upon the mere allegations contained in his complaint in opposition to a properly supported summary judgment motion made against him. *Id.* at 289, 88 S.Ct. at 1592.

## SCOPE OF COURT REVIEW—ROOKER-FELDMAN DOCTRINE

Plaintiff Thomas alleges that defendants conducted themselves improperly in order to achieve a pre-ordained result, namely, the inclusion of Thomas' name on the List. Recognizing the responsibility of the Board and Commission to patrol this industry, vital to the economy of Nevada, *Spilotro*, 99 Nev. at 191–92, 661 P.2d at 470; *State v. Glusman*, 98 Nev. 412, 417–18, 651 P.2d 639, 643 (1982); *State v. Rosenthal*, 93 Nev. 36, 40–41, 559 P.2d 830, 833 (1977); *Nevada Tax Comm'n v. Hicks*, 73 Nev. 115, 119, 310 P.2d 852, 854 (1957), and recognizing the constitutional rights of a person whose name is placed on the List, *Rosenthal*, 93 Nev. at 45, 559 P.2d at 836; Nev.Rev.Stat. § 463.312 (1987), the court takes very seriously the charges alleged by plaintiff and thoroughly reviews the administrative proceedings.

---

**9.** *Maybe,* involved a First Amendment question and the Ninth Circuit reversed the district court's grant of summary judgment because a complex motivational analysis was necessary and had not been undertaken. "No such slippery motivational analysis is needed here, and there is no indication that a constitutional issue that is as clear-cut and factually complete as the one presented in this case should not be decided via summary judgment." *Safeway Stores v. Bd of Agric. of State of Hawaii*, 590 F.Supp. 778, 786 (D.Haw.1984), *citing Maybe v. Reagan*, 537 F.2d 1036 (9th Cir.1976).

■ The remedy for alleged "irregularities" affecting the outcome of a state administrative proceeding is through a judicial review in a state district court. A federal district court does not have jurisdiction to review final determinations of state court judicial proceedings; only the United States Supreme Court has such jurisdiction. *Dist. of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482, 103 S.Ct. 1303, 1314, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415–16, 44 S.Ct. 149, 150, 68 L.Ed. 362 (1923) (the "Rooker–Feldman doctrine").

■ The general rule is that if a party requests a federal district court to scrutinize the conduct of the jurist to determine whether he complied with a procedural rule, such conduct constitutes a review of a judicial decision of a state court judge and the federal court is without jurisdiction. *Feldman*, 460 U.S. at 482, 103 S.Ct. at 1315. However, if a party alleges a constitutional defect in the procedures with which a jurist is required to comply, such allegations may fall outside the scope of the Rooker–Feldman doctrine and leave the jurisdiction of the federal district court intact. *Id.* at 486, 103 S.Ct. at 1316.

In the instant action, the issue is not whether the statutes authorizing the exclusionary list are constitutionally defective, they are not. *Spilotro*, 99 Nev. at 195, 661 P.2d at 472. Instead, the issue is whether the Board and the Commission administered the exclusionary process and hearings "fairly" and without "pre-disposition" to satisfy constitutional requirements.

■ If the court were to examine the administrative proceedings to determine whether the Board and Commission complied with procedure, the examination would fall within the scope of the Rooker–Feldman Doctrine. Consequently, the court would be without jurisdiction to make such an examination, as it generally is. However, in the instant action, contrary to the general rule, the court is statutorily vested, under section 1983, with original jurisdiction to examine the Board and the Commission's compliance with statutory procedures for the express purpose of determining whether or not plaintiff's constitutional rights were violated.[10]

42 U.S.C. § 1983:

■ The language of 42 U.S.C. § 1983 provides for the protection of "rights, privileges, or immunities secured by the Constitution and laws."[11] The first inquiry in a section 1983 suit is whether a plaintiff has been deprived of a right secured by the Constitution or laws of the United States. If there has not been a deprivation of a federal right, plaintiff has failed to satisfy the threshold requirement for maintaining a section 1983 action. *Jones v. Hopper*, 410 F.2d 1323 (10th Cir.), *cert. denied*, 397 U.S. 991, 90 S.Ct. 1111, 25 L.Ed.2d 399 (1970).

PROCEDURAL DUE PROCESS:

In the instant action, plaintiff first alleges that he was nominated for the List by the Board without notice or a hearing. (Plaintiff's Complaint (No. 1) p. 7). Second, plaintiff alleges that defendants did not afford plaintiff a fair and impartial hearing; that "[a]t every turn, the defendants, Bible, in particular, prosecuted the Board's

---

10. "In exercising such jurisdiction, the federal court is confined to adjudicating those facts necessary to resolve the constitutional claims. (citations omitted). The U.S. District Court is not to determine whether a mistake was made in the state proceedings as to a particular individual; it is to adjudicate whether there was a denial of due process or equal protection. If such denial is found, then individual relief may be granted. (citation omitted)." *Louis*, 490 F.Supp. at 1179.

11. *Civil action for deprivation of rights.*

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia." 42 U.S.C. § 1983.

case to arrive at the pre-ordained decision, namely, the inclusion of plaintiff's name in the Black Book." (Plaintiff's Opposition to Defendant's Motion to Dismiss (No. 20) p. 15).

 As to the first contention, plaintiff alleges that Nev.Rev.Stat. § 463.060 requires that "the Board give notice before the Board [nominates] Thomas' name" for the List. (Plaintiff's Statement of Facts in Support of Opposition to Defendants' Motion to Dismiss (No. 20A) p. 6). The court finds that plaintiff's allegation is without merit.[12]

As to the second contention, since the Board followed the process outlined in nominating plaintiff for the List,[13] and

since the Commission followed the procedures outlined in staying the implementation of its final order of exclusion and allowed plaintiff to pursue his rights to judicial review, including review by this court,[14] the court's analysis of an alleged procedural due process violation centers on whether the actual hearings provided plaintiff with "the opportunity to be heard."

 Licensed gaming is a privilege conferred by the state and does not carry with it the rights inherent in useful trades and occupations. *Rosenthal*, 93 Nev. at 44, 559 P.2d at 835; *see also Posadas de Puerto Rico Assoc. v. Tourism Co.*, 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986);

12. NGC Reg. 28.060(1) provides in pertinent part that after the Board has determined an individual should be placed on the List, notice of such determination shall be given to the candidate by the various procedures that are set forth in NGC Reg. Plaintiff alleges a violation of NGC Reg. 28.060(1) by focusing on the words "should be placed" and argues that the Board is prohibited from placing the candidate on the List before the Board provides the candidate with notice of its determination.

Nev.Rev.Stat. § 463.152 provides that whenever the candidate is placed on the List pursuant to Nev.Rev.Stat. § 463.151, the Board shall serve notice of such fact to the candidate by specific statutory procedure, which is repeated in NGC Reg. 28.060.

Nev.Rev.Stat. § 463.153 provides that after such service, the candidate may demand a hearing before the Commission and show cause why he should not have his name on the List. Subsection (3)(b) provides that after the hearing, if the Commission determines that placing the candidate on the List was proper, the Commission shall make and enter into its minutes an order to that effect. Nev.Rev.Stat. § 463.153(3)(b) (1987).

The court finds that the notice provision in NGC Reg. 28.060 satisfies procedural due process and ensures that the candidate becomes aware of the Board's action pending the candidate's right to a hearing before the Commission. NGC Reg. 28.060(2)(3); Nev.Rev.Stat. § 463.152 (1987).

13. On April 8, 1986, the Board filed its second order conditionally nominating plaintiff for the List, (Defendants' Motion to Dismiss (No. 16), Exhibit 11(b) pp. 963–64, 1007) ("Exhibit 11(b)"), and its notice of exclusion informing plaintiff that he could request a hearing before the Commission. (Defendants' Motion to Dismiss (No. 16), Exhibit 11(a) pp. 9–10) ("Exhibit 11(a)").

The Board order would not be effective until (1) notice of the decision had been given to Thomas in the manner prescribed by Nev.Rev. Stat. § 463.152 and NGC Reg. 28.060 and Thomas had failed to timely request a hearing before the Commission; or (2) the Commission affirmed the decision of the Board after a hearing in the matter had been conducted pursuant to the applicable provisions of NGC Reg. 28.

On May 13, 1986, plaintiff timely requested a hearing before the Commission in which he asked that he be personally present at the Commission hearing. Exhibit 11(a) pp. 12–14. Plaintiff also filed a request for a bill of particulars specifying the grounds upon which the Board's determination of exclusion had been made and discovery of all evidentiary materials relied upon by the Board. *Id.* at 15–16. The Board filed its bill of particulars on November 6, 1986. *Id.* at 56–65.

The court notes that the bill of particulars is very similar to the Board's original order of April 8, 1986. Exhibit 11(a) pp. 1–8, 56–64. Plaintiff admitted during the hearing that the bill of particulars contained no new substantive matters as compared to the Board's original order. Exhibit 11(a) p. 173.

14. The possibility of staying the Commission's decision pending plaintiff's right to petition for judicial review was first raised by Chairman Bible. Exhibit 11(b) pp. 1053–58. Following a hearing on February 19, 1987, the Commission granted a stay conditioned upon plaintiff filing a petition for judicial review in state court and his agreement not to enter a casino during the pendency of the stay. *Id.* at 1094–1132; Nev. Rev.Stat. §§ 463.315–.318 (1987). On June 18, 1987, after plaintiff failed to petition for judicial review in state court, the Commission modified its stay at another hearing, so as to allow plaintiff to file this federal action. Exhibit 11(b) pp. 1148–74. The court notes that plaintiff has not sought state court review of the Commission's decision.

*Dunn v. Tax Comm'n,* 67 Nev. 173, 216 P.2d 985 (1950); *State ex rel. Grimes v. Board,* 53 Nev. 364, 1 P.2d 570 (1931). Licensed gaming is a matter reserved to the states within the meaning of the Tenth Amendment to the United States Constitution. "Within this context, we find no room for federally protected constitutional rights. This distinctively stated problem is to be governed, controlled and regulated by the state legislature and, to the extent the legislature decrees, by the Nevada Constitution." *Rosenthal,* 93 Nev. at 44–45, 559 P.2d at 836.

■ A candidate for the List is entitled to certain procedural due process rights, i.e., notice and an opportunity to be heard, because the State's action places his reputation at stake.[15] *Id.; Spilotro,* 99 Nev. at 195, 661 P.2d at 472; *Wisconsin v. Constantineau,* 400 U.S. 433, 436–37, 91 S.Ct. 507, 509–10, 27 L.Ed.2d 515 (1971); Nev. Rev.Stat. § 463.153 (1987).

Initially, the Board "informally review[s] the information and evidence in its possession and make[s] a determination that there is sufficient reason" for placing a particular individual's name on the List. Nevada Gaming Commission Regulation 28.030 ("NGC Reg."). At least two Board members must concur in such decision of an investigative hearing. NGC Reg. 28.030(1). After the Board has determined that an individual should be placed upon the List, "notice of such determination shall be given to said person," advising him of his right to a hearing before the Commission pursuant to NGC Reg. 28.060 and Nev.Rev. Stat. § 463.153.

Pursuant to Nev.Rev.Stat. 463.151, the Commission established NGC Reg. 28 et seq. to provide the List procedures. Specifically, NGC Reg. 28.070 incorporates by reference the procedures, rights and remedies stated in Nev.Rev.Stat. § 463.010 et seq. for the conduct of an exclusionary hearing before the Commission, including those in Nev.Rev.Stat. § 463.310 and those in the applicable sections of NGC Reg. 7, which apply to any hearing provided a candidate.

A candidate may demand a hearing before the Commission "and show cause why he should have his name taken from [the List]." Nev.Rev.Stat. § 463.153(1) (1987). A party may take depositions in the manner provided by Nevada Rule of Civil Procedure. Nev.Rev.Stat. § 463.3125(2) (1987); NGC Reg. 7.080. The Commission shall issue subpoenas and subpoenas duces tecum at the request of a party. Nev.Rev. Stat. § 463.3125(1) (1987); NGC Reg. 7.070.

A candidate has the right to be represented by counsel and to "present his defense to the charges contained in the complaint." NGC Reg. 7.020(2). Oral evidence may only be taken upon oath or affirmation administered by the Commission. Nev. Rev.Stat. § 463.313(1)(a) (1987); NGC Reg. 7.040(1). Every party has a right to call and examine witnesses; introduce exhibits; cross-examine opposing witnesses; impeach any witness; and offer rebuttal evidence. Nev.Rev.Stat. § 463.313(1)(b)(1–5) (1987); NGC Reg. 7.040(3). A hearing need not technically comport with strict rules of evidence, and hearsay can be accepted and considered by the Commission. However, only relevant evidence may be admitted. NGC Reg. 7.050.

The exclusionary hearing must be reported. Nev.Rev.Stat. § 463.3133(2) (1987). The Board must prove its case based upon a clear and convincing evidence standard. NGC Reg. 7.140(1). Only upon the Board

---

**15.** On August 23, 1979, since the Commission accepted the stipulation under which the Board and plaintiff agreed to a revocation of his licenses and to a payment of a fine, Exhibit 11(b) pp. 876–77, 781–97, the court holds that plaintiff's right to procedural due process at the hearings before the Commission on December 17, 1986, and January 22, 1987, is founded only "because the State's action places his reputation at stake." *Spilotro,* 99 Nev. at 195, 661 P.2d at 472. It is not founded on the property interest of a licen-

see, *Rosenthal,* 93 Nev. at 42, 559 P.2d at 834, or on a property right to enter a casino. *Spilotro,* 99 Nev. at 194, 661 P.2d at 471.

"The legislature has carefully distinguished between persons who have been licensed and those who never have been licensed." *Rosenthal,* 93 Nev. at 42, 559 P.2d at 834. "[A licensed person] does have an existing privilege, and is entitled to receive notice and a hearing before his privilege to work as a gaming employee can be nullified." *Id.* at 47, 559 P.2d at 837.

establishing its prima facie case must a candidate show cause why he should have his name taken from the List.

The Commission must "render a written decision on the merits which must contain findings of fact, a determination of the issues presented and the penalty to be imposed, if any." Nev.Rev.Stat. § 463.3145(1) (1987); NGC Reg. 7.140(1). A candidate has the right to petition for judicial review of the Commission's final order of exclusion. Nev.Rev.Stat. § 463.152 (1987). The statutes governing judicial review are set forth in Nev.Rev. Stat. §§ 463.315–.318.

The state district court can remand the case back to the Commission for further hearings or can reverse the Commission's decision on the grounds specified in Nev. Rev.Stat. § 463.317(3). If the state district court affirms the Commission's decision, a candidate has the right of appeal to the Nevada Supreme Court. Nev.Rev.Stat. § 463.318(1) (1987).

█ In the instant action, the court finds that plaintiff was not denied procedural due process at the hearings before the Commission. Plaintiff had notice and the right to a hearing, with prehearing discovery. Plaintiff was represented by an attorney and had the opportunity to present his case and argue his position.[16]

Plaintiff through his attorney presented evidence; cross-examined the Board's witnesses; and objected to the admission of the Board's evidence, having parts of it ruled inadmissible.[17] Plaintiff through his attorney made an opening statement, and presented evidence in support of his position that the Board selected plaintiff because of his refusal to cooperate and not because his presence in a casino would pose a threat. (Defendants' Motion to Dismiss (No. 16), Exhibit 11(b) pp. 1018–34) ("Exhibit 11(b)"). Plaintiff's attorney offered rebuttal evidence, made a closing argument and exercised the right to judicial review.

After the conclusion of the arguments, the Commission deliberated on the public record and voted to place plaintiff on the List.[18] The court finds that the adversarial proceedings afforded plaintiff a fair and impartial hearing.

Further, the record refutes plaintiff's allegations that "[a]t every turn, the defendants, Bible, in particular, prosecuted the Board's case to arrive at the pre-ordained decision, namely, the inclusion of plaintiff's name in the Black Book." (Plaintiff's Opposition to Defendants' Motion to Dismiss (No. 20) p. 15).

█ The law is clear that there is a presumption that state officials act in good

16. Plaintiff was represented by counsel but did not attend either the December 17, 1986 or the January 22, 1987 hearing. At plaintiff's request, the originally scheduled hearing was reset for December 17, 1986, so that plaintiff could personally attend the hearing after his release from prison. Exhibit 11(a) pp. 20–33. A dispute subsequently arose stemming from plaintiff's entrance into a half-way house several months before his scheduled release date. Id. at 261–65. The dispute involved whether or not plaintiff could attend a hearing prior to December 17, 1986. Id. at 34–55. The Board contacted the Federal Bureau of Prisons to determine if plaintiff could attend a hearing prior to the scheduled date. Id. at 45–50. The dispute became moot at the commencement of the December 17th hearing. Id. at 195.

17. Prior to the hearing on December 17, 1986, the Commission issued a subpoena duces tecum at plaintiff's request against the Board's custodian of records and the Board's Agent, Richard Carr. Exhibit 11(a) pp. 66–76, 90–102. On November 18, 1986, the Board filed a motion for

protective order to preclude the production of documents from its custodians. Id. at 77–89. At Bible's direction, the parties briefed the matter. Id. at 103–105, 117–27, 131–38. During the telephone conference call hearing on December 5, 1986, Bible stated that the privilege asserted by the Board, under Nev.Rev.Stat. §§ 463.120(4) and 463.335(1), was not absolute but qualified. As a result, Bible imposed a balancing test to determine what, if any, particular record or document should be discoverable. Bible granted the Board's motion in part and denied it in part. Id. at 139–59. On December 9, 1986, a written order was entered directing the Board to provide plaintiff with certain discovery. Id. at 160–64.

18. The Commission's final written order contained findings of fact and conclusions of law and determined that Thomas is a person whose presence in a casino poses a threat to the interests of Nevada and to licensed gaming pursuant to Nev.Rev.Stat. §§ 463.0129(1) and 463.151(2) and that his name on the List furthers the public policy of Nevada. Id. at 1133–140.

faith in the performance of their official duties, *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975); *Trans–Sterling v. Bible,* 804 F.2d 525, 529 (9th Cir.1986), and that procedural "irregularities" do not amount to a violation of due process. *Adkins v. Underwood,* 520 F.2d 890, 893 (7th Cir.), *cert. denied,* 423 U.S. 1017, 96 S.Ct. 452, 46 L.Ed.2d 389 (1975).

■ Plaintiff alleges that former Chairman Bible required only plaintiff to file a pre-hearing brief prior to the hearing on December 17, 1986,[19] that Bible "took judicial notice ... without any request to do so by the Board," [20] (Plaintiff's Opposition to Defendants' Motion to Dismiss (No. 20) p. 6); that Bible admitted his own exhibit ... prior to any statement, evidence argument or question by the parties," [21] *Id;* that Bible ordered a second hearing to "re-open the case" because "the Commission recognized that the record did not support their preordained decision to include Thomas' name in the Black Book," [22] *Id.* at 7; and that Bible contradicted a prior ruling which established a briefing schedule.[23] *Id.* at 13.

**19.** Prior to the hearing, the Commission ordered that any legal memorandum in support of or in opposition to the Notice of Exclusion should be filed on or before December 8, 1986. Exhibit 11(a) pp. 31–33. Thomas filed such a brief, *Id.* at 165–91, but the Board did not. Later on, after the first hearing, both sides were directed to file briefs to help the Commission evaluate the case. *Id.* at 435–37. Thomas filed a brief under protest. *Id.* at 881–916. The Board filed its brief with the Commission, *Id.* at 925–50, but Thomas' counsel did not receive a copy of the Board's brief prior to the January 22, 1987, hearing. *Id.* at 981–83. Consequently, the Commission recessed the hearing to allow Thomas' counsel an opportunity to read the Board's brief. *Id.* at 983–84.

**20.** On December 17, 1986, at the hearing, Bible informed counsel for both parties of an official file containing the records and files of the Commission in preparation for this case. Bible took judicial notice of the file and the Commission subsequently provided a copy of the complete file to both counsel for the Board and for plaintiff.

The court finds that the basis for taking judicial notice is contained in Nev.Rev.Stat. § 463.313(2), which empowers the Commission to take official notice. The statutory standard for judicial notice is included in Chapter 47, Nev.Rev.Stat. Specifically, Nev.Rev.Stat. § 47.130 authorizes judicial notice of generally known facts within the jurisdiction of the court. Judicial notice may be taken either at the request of counsel or by the judge, court or proceeding body whether requested or not.

**21.** (excerpt from the December 17, 1986, hearing before the Commission)

CHAIRMAN BIBLE: "Well, you can respond as soon as I explain the source of my memorandum. When there is a matter which is filed with the Commission where the Commission must act in an adjudicatory role, such as the hearing that we are now conducting, the Attorney General will assign one deputy or more to represent the Board and separate deputies, one or more, to represent and advise the Commis-

sion. It is the policy of the Attorney General's Office that the two deputies who are representing the Board and the Commission respectively do not communicate or have any discussions with one another relative to the merits.

What I received was prepared by Deputy Jim Giudici. Mr. Giudici prepared what I refer to as a bench memorandum. He has assisted the Commission and he's assisted me as Chairman of the Commission throughout the proceedings in this matter in the preparation of certain legal memorandum and certain of the research that is necessary for me to arrive at the determination as to the procedural decisions that I have made up until now, and the decisions that I made today.

In addition to that, at my direction and supervision, Mr. Giudici reviewed the file of the Commission relating to Black Book proceedings, and that is how I have the information as to the files not only on Mr. Thomas but on Mr. Agosto and Mr. DeLuna, *which I just put in the record.* I have the assurance of the Attorney General and the assurance of the deputies within the Attorney General's Office that there is no communication between the deputies relative to that. In other words, Mr. Callaway does not communicate with Mr. Giudici relative to this matter, and Mr. Giudici likewise does not communicate with him." Exhibit 11(a) pp. 299–300 (emphasis added).

**22.** (excerpt from the December 17, 1986, hearing before the commission)

CHAIRMAN BIBLE: "Now, in the event either of the parties between now and January the 8th determines that they would wish to reopen their case, you may address a request to do that to me in the same fashion that the order discovery requests have been made, and I will consider it, and in that request I'd like to know the reason or reasons for reopening, the evidence that would be expected to be introduced, and the witnesses who would verify or testify consistent with the proffered evidence." Exhibit 11(a) p. 437.

**23.** Bible ruled that if the Commission received a request to reopen the case which involved sub-

The court finds that these allegations fail to make a showing sufficient to establish the existence of an element essential to plaintiff's case. Defendants have shown conclusively that the facts upon which plaintiff's allegations are based are not susceptible to the interpretation plaintiff seeks to give them. *Cities Services*, 391 U.S. at 288, 88 S.Ct. at 1592. As a result, plaintiff may not continue to rest upon the mere allegations contained in his complaint in opposition to a properly supported summary judgment motion made against him. *Id.* at 289, 88 S.Ct. at 1592–93. Plaintiff must provide significant probative evidence to demonstrate that a trial is warranted.

Because defendants provided sworn testimony to refute plaintiff's allegation, plaintiff has the affirmative burden under *Celotex* to counter defendants' sworn statements with sworn counter-statements or other refuting evidence. However, to meet this burden, plaintiff only offers general assertions, sprinkled with references to a few specific instances in the hearing transcripts, that the proceedings amounted to a violation of his constitutional right to procedural due process. Plaintiff has provided no evidence that suggests the Commission had a personal bias against him.

The court finds that the alleged discrepancies do not amount to a "genuine" issue of material fact; that is, that the evidence presented by plaintiff is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby*, 477 U.S. at 247–48, 106 S.Ct. at 2509-10, 91 L.Ed.2d at 211–12; *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53, 91 L.Ed.2d at 273–74. The court finds that plaintiff's right to procedural due process under the Fourteenth Amendment was not violated.

DOCTRINE OF PRECLUSION:

■ The Supreme Court, in *Univ. of Tennessee v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), held that when a state agency, hearing an action brought under civil rights statutes, such as sections 1983 and 1985, and "acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate," *United States v. Utah Const. & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966), the federal court must give the agency's fact finding the same preclusive effect to which it would be entitled in the State court. *Elliott*, 478 U.S. at 798–99, 106 S.Ct. at 3226–27, 92 L.Ed.2d at 646–47. This rule applies even though the administrative proceeding was not reviewed by a state court. *Id.* at 794–99, 106 S.Ct. at 3224–27, 92 L.Ed.2d at 643–47. *See Shaw v. California Dept. of Alcoholic Beverage Control*, 788 F.2d 600 (9th Cir.1986).[24]

■ The court recognizes the applicability of the "doctrine of preclusion" when a state agency acts in a judicial capacity and the parties have an adequate opportunity to litigate the issues. *Barber v. American Sec. Bank*, 655 F.Supp. 775, 777 (D.D.C. 1987). However, in the instant action, the the cases of *Elliott* and *Shaw* are distinguishable in their application to the present facts. Unlike *Elliott* and *Shaw*, the exclusionary hearings on December 17, 1986 and January 22, 1987 were the source of the alleged Fifth Amendment and Equal Protection violations. The court examines plaintiff's alleged violations of his Fifth Amendment and Equal Protection claims.

FIFTH AMENDMENT:

■ The Fifth Amendment provides that "No person ... shall be compelled in any criminal case to be a witness against himself." The Fifth Amendment privilege against self-incrimination protects an individual from being a witness against himself in a criminal matter and is applicable to the states through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1,

---

stantial additional matters, Bible would then consider altering the briefing schedule. Exhibit 11(a) pp. 437–448.

**24.** The district court, in a section 1983 case, gave preclusive effect to a state agency decision which had been appealed to the state court. The district court declined to review the agency decision and held that there had been a full and fair opportunity to litigate at the agency level despite limitations on discovery. *Shaw*, 788 F.2d at 606.

6, 84 S.Ct. 1489, 1492, 12 L.Ed.2d 653 (1964). The privilege may be invoked in any proceeding against an individual, either civil or criminal, in which testimony or evidence is requested of that individual which could expose him to later criminal prosecution. *Id.* at 11, 84 S.Ct. at 1495.

In the instant action, plaintiff first alleges that the Board violated his Fifth Amendment privilege by using plaintiff's immunized testimony from the Argent case in the exclusionary proceeding and by the Commission focusing on the criminality of plaintiff's prior acts. (Plaintiff's Opposition to Defendants' Motion to Dismiss (No. 20) p. 13). Second, plaintiff alleges that the Board violated plaintiff's Fifth Amendment right by sending Agent Richard Carr to investigate plaintiff for purposes of inclusion on the List and, at the same time, to obtain plaintiff's cooperation in other Board investigations. *Id.* at 12, 84 S.Ct. at 1496.

█ As to the first contention, during the Board's case in chief, plaintiff's admission of skimming in the Argent case was not admitted by the Commission because of a pleading defect in the Board's original order nominating Thomas for inclusion on the List. Later, during the Board's rebuttal, reference was made to plaintiff Argent's testimony. However, the reference was admitted only for the limited purpose of reviewing the reasons why plaintiff had originally been nominated by the Board for exclusion.[25]

Further, as to the first contention, the Commission, in determining whether to exclude certain candidates, may consider any "[p]rior conviction of a crime which is a felony in this state or under the laws of the United States, a crime involving moral turpitude or a violation of the gaming laws of any state." Nev.Rev.Stat. § 463.151(3)(1) (1987); *see also Spilotro*, 99 Nev. 187, 661 P.2d 467 (1983); *Rosenthal*, 93 Nev. 36, 559

P.2d 830 (1977); *Dunn v. Tax Comm'n*, 67 Nev. 173, 216 P.2d 985 (1950). The court finds that the use of the immunized testimony was proper.

█ As to the second contention, the court recognizes that an exclusionary hearing by the Commission is a civil administrative action rather than criminal prosecution, *Spilotro*, 99 Nev. at 191–92, 661 P.2d at 470, and recognizes that testimony that has been given in a criminal proceeding under a grant of immunity may be used in a subsequent civil administrative proceeding. *see In re Daley*, 549 F.2d 469 (7th Cir.), *cert. denied*, 434 U.S. 829, 98 S.Ct. 110, 54 L.Ed.2d 89 (1977); *Napolitano v. Ward*, 457 F.2d 279 (7th Cir.), *cert. denied*, 409 U.S. 1037, 93 S.Ct. 512, 34 L.Ed.2d 486 (1972). Because an exclusionary hearing is not a criminal prosecution and because immunized testimony may be used in a subsequent civil administrative proceeding, the court's analysis of the alleged Fifth Amendment violation centers on plaintiff's allegation that he invoked a Fifth Amendment privilege because he may incriminate himself. (Plaintiff's Opposition to Defendants' Motion to Dismiss (No. 20) pp. 12–13).

█ To properly invoke the privilege against compulsory self-incrimination, a defendant must be faced with "substantial hazards of self-incrimination," *California v. Byers*, 402 U.S. 424, 429, 91 S.Ct. 1535, 1538, 29 L.Ed.2d 9 (1971), that are "real and appreciable" and not merely "imaginary and unsubstantial." *Marchetti v. United States*, 390 U.S. 39, 48, 88 S.Ct. 697, 702, 19 L.Ed.2d 889 (1968) *quoting Rogers v. United States*, 340 U.S. 367, 374–75, 71 S.Ct. 438, 442–43, 95 L.Ed.2d 378 (1951). Moreover, the defendant must have "reasonable cause to apprehend [such] danger from a direct answer" to questions posed to him. *Hoffman v. Unit-*

---

**25.** At the hearing before the Commission on December 17, 1986, the Board offered into evidence plaintiff's Tropicana indictment and conviction order. Exhibit 11(a) pp. 1–8, 56–65. However, the Argent indictment, as to plaintiff and plaintiff's testimony in the Argent case, was ruled by the Commission as inadmissible due to

a pleading defect in the Board's notice of exclusion and bill of particulars. *Id.* at 235–60. Later, plaintiff's immunized testimony was admitted for the limited purpose of evaluating why the Board selected plaintiff for the List. Exhibit 11(b) pp. 965–66, 988–96.

*ed States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951).

Further, the law does not permit the defendant to be the final arbiter of the validity of his own assertions. "The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to decide whether his silence is justified...." *Hoffman,* 341 U.S. at 486, 71 S.Ct. at 818; *see also Marchetti,* 390 U.S. at 50, 88 S.Ct. at 703; *United States v. Neff,* 615 F.2d at 1235, 1240 (9th Cir.1980).

Plaintiff alleges that he asserted a Fifth Amendment privilege by refusing "under any circumstance" to be interviewed by the Board's investigative agents; that Ron Hollis ("Hollis"), testified that the Board attempted to obtain Thomas' incriminating statements by threatening to include his name on the List; and that Hollis' testimony sufficiently shows that defendants intended to penalize plaintiff's use of his Fifth Amendment right against compelled self-incrimination. (Plaintiff's Opposition to Defendants' Motion to Dismiss (No. 20) p. 12).

Plaintiff did not meet with a representative of the Board nor did he refuse to respond to a specific question. Instead, plaintiff only blanketly asserted that he would not cooperate because his cooperation could be used against others or could lead to other evidence that might be used against him. Exhibit 11(a) pp. 1018–34.

 Merely suggesting hypothetical situations which give rise to generalized fear of criminal prosecution is not a sufficient basis for a Fifth Amendment claim. *Boday v. United States,* 759 F.2d 1472, 1474–75 (9th Cir.1985). Further, the Fifth Amendment privilege does not encompass testimony which incriminates other persons a witness wishes to protect, but only protects against self-incrimination. *Rogers,* 340 U.S. at 370–71, 71 S.Ct. at 440–41.

██ Plaintiff cites *New Jersey v. Portash,* 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979), to support his position that the Fifth Amendment privilege against compulsory self-incrimination exists even if a person asserting it does not testify at a particular hearing. (Plaintiff's Opposition to Defendants' Motion to Dismiss (No. 20) pp. 10–11). The issue before the Supreme Court in *Portash* was whether, despite the constitutional privilege against self-incrimination, a prosecutor may use a person's legislatively immunized grand jury testimony to impeach his credibility as a testifying defendant in a subsequent criminal trial. *Portash,* 440 U.S. at 451, 99 S.Ct. at 1293.

*Portash* provides no help on the question before the court because the Supreme Court rested its decision on the fact that the state courts had treated the constitutional question as properly presented. *Id.* at 454–55, 99 S.Ct. at 1294–95; *see also United States v. Cook,* 608 F.2d 1175 (9th Cir.1979). In the instant action, plaintiff's allegation that he may incriminate himself or others is too remote and speculative an injury to invoke the federally protected right.

Defendants submit the testimonies of Hollis and Michael Rumbolz ("Rumbolz"). Rumbolz, then a member of the Board and now the Chairman, had personal knowledge of the reasons for plaintiff's nomination. Rumbolz testified that cooperation was not a factor. Exhibit 11(b) pp. 996–97. Hollis, a Board agent and witness, testified that the investigation which lead to plaintiff's exclusionary proceeding began in 1985, before cooperation was an issue. (Defendants' Motion to Dismiss (No. 16), Exhibit 11(a) pp. 335–36) ("Exhibit 11(a)"); Exhibit 11(b) p. 1007. Hollis also testified that the Fifth Amendment privilege was never mentioned in response to the Board's request for information, but that plaintiff's attorney simply informed the Board Agent, Richard Carr, that plaintiff declined to be interviewed. Further, Hollis testified that he did not make the Board's decision to nominate plaintiff for the List.

The evidence indicates only that the Commission weighed the evidence and made its

ruling.[26] There is no other reasonable inference.

Defendants have provided sworn testimony refuting plaintiff's Fifth Amendment claim. Plaintiff now has an affirmative burden to counter defendants' sworn statements with contrary evidence. *Celotex* 477 U.S. at 322–23, 106 S.Ct. at 2552–53, 91 L.Ed.2d at 273–74; *Cities Services,* 391 U.S. at 289, 88 S.Ct. at 1592. But plaintiff only argues that if he had cooperated, there would be no need for him to be on the List and that Hollis would have had second thoughts about attempting to include him on the List. The argument is based solely upon an excerpt from Hollis' testimony, which is unpersuasive because Hollis also testified that he did not make the Board's decisions. Exhibit 11(a) pp. 334, 339, 439. This is not and does not involve the protection provided for or intended by the Fifth Amendment.

Since plaintiff cannot rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion, *Cities Services,* 391 U.S. at 290, 88 S.Ct. at 1593, and since plaintiff has provided no contrary evidence of a properly invoked Fifth Amendment privilege against self-incrimination, the court, for the purpose of the motion, must take Rumbolz and Hollis' sworn testimonies before the Commission as true. There was no violation of plaintiff's Fifth Amendment right under the Fourteenth Amendment during the administrative process.

EQUAL PROTECTION:

In the instant action, plaintiff first alleges an equal protection violation because the Board singled out and prosecuted plaintiff for "a reason which is offensive to the Constitution (namely, his invocation of his Fifth Amendment protection against self-incrimination)." (Plaintiff's Opposition to Defendants' Motion to Dismiss (No. 20) p.

20). Second, plaintiff alleges that the Board's discriminatory application of the law to plaintiff without a rational basis for the discrimination and the Board's decision not to apply the law to other people who were involved in licensed gaming or who were involved in the Tropicana or Argent case constitute an equal protection violation. *Id.* at 16–17, 20.[27]

As to the first contention, as discussed above, plaintiff's Fifth Amendment right was not violated during the administrative process because plaintiff did not and cannot invoke a blanket Fifth Amendment privilege against possible future incrimination.

As to the second contention, the court dismisses as overbroad the allegation that the Board and Commission have "permitted hundreds of people to work in the gaming industry who have criminal convictions, including gaming-related convictions and convictions for murder, racketeering, bombings of casinos and child molestation." *Id.* at 17. The court's analysis of the alleged equal protection violation centers on plaintiff's allegation that the Board has no rational basis for narrowing the possible candidates in such a way as to include plaintiff because all of the "defendants" in the Tropicana and the Argent case, who were convicted or pled guilty, are "similarly situated" for the purposes of being placed on the List. *Id.* at 16.

Equal protection does not require identity of treatment. *United States v. Bell,* 506 F.2d 207, 222 (D.C.Cir.1974) *quoting Walters v. City of St. Louis,* 347 U.S. 231, 237, 74 S.Ct. 505, 509, 98 L.Ed. 660 (1954). It only requires that classification rest on real and not feigned differences, that the distinction has some relevance to the purpose for which the classification is made and that the different treatments be

26. The Commission found as a matter of fact that the Board did not nominate Thomas due to his refusal to cooperate in the Fertitta investigation. Exhibit 11(b) p. 1139.

27. "Not only did the Board and Commission in this case not attempt to include persons similarly situated to Thomas in the Black Book, the Board and Commission consciously permitted persons to work in the gaming industry of Nevada when they had been convicted to gaming-related offenses, such as skimming and organized crime, and such felonies as murder, child molestation, embezzlement, forgery, counterfeiting and racketeering." (Plaintiff's Opposition to Defendants' Motion to Dismiss (No. 20) p. 20).

not so disparate, relative to the difference in classification, as to be wholly arbitrary. *Id; see also Washington v. United States,* 401 F.2d 915, 923 (D.C.Cir.1968).

A discriminatory purpose is not presumed, there must be a showing of "clear and intentional discrimination;" *Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944), "a difference either based on a constitutionally suspect standard or lacking in rational justification." *Washington,* 401 F.2d at 923; *see also Loving v. Virginia,* 388 U.S. 1, 9, 87 S.Ct. 1817, 1822, 18 L.Ed.2d 1010 (1967); *McLaughlin v. Florida,* 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).

■ What must be established is first, that while one has been singled out for prosecution, others similarly situated have not generally been prosecuted even though they engage in similar conduct to the conduct which forms the basis of the charge against plaintiff and second, that the government's deliberate discriminatory selection for prosecution has been invidious or in bad faith, that is, based upon an unjustifiable standard such as race, religion, or the desire to prevent his exercise of constitutional rights. *Oyler v. Boles,* 368 U.S. 448, 454–56, 82 S.Ct. 501, 504–06, 7 L.Ed.2d 446 (1962); *Snowden v. Hughes,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944); *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (by implication). The discrimination must be intentional and purposeful and require selection based on an impermissible factor.

Plaintiff cites *Ali v. Div. of State Athletic Comm'n,* 316 F.Supp. 1246 (S.D.N.Y. 1970), in support of his position that "the Commission and the Board, like the commission in *Ali,* violated Thomas' rights to the equal protection of the laws." (Plaintiff's Opposition to Defendants' Motion to Dismiss (No. 20) p. 18). The case involved a declaratory judgment and injunction. Consistent with the above cases, the court in *Ali,* held that a deliberate and arbitrary discrimination or inequality in the exercise of regulatory power, not based upon differences that are reasonably related to the lawful purposes of such regulation, violates the Fourteenth Amendment. *Ali,* 316 F.Supp. at 1250.[28]

■ In the instant action, the court finds no vice of that character in this case. The evidence indicates that plaintiff was a mastermind behind the conspiracy to skim and undertook to tutor members of organized crime as to the best method of skimming from Nevada casinos; *DeLuna,* 763 F.2d at 915, that he was involved in skimming while he held gaming licenses;[29] and that he had close ties to Nevada.[30] The Board had this information as background when it decided to proceed with the exclusionary process against plaintiff.

Thomas has not shown a purposeful discrimination between plaintiff and the other Tropicana and Argent case "defendants" and cannot supply the disparity by alleging "pre-determined" and "intentional" without evidence of deliberate and arbitrary discrimination or inequality in the exercise of the Board's failure to proceed against the other "defendants." Words alone disclose nothing as to the purpose or consequence

28. "In short, the exercise of state power by a state agency in the issuance or refusal of licenses to engage in a regulated activity should not represent the exercise of mere personal whim, caprice or prejudice on part of such agency. It should, and constitutionally must, have some rational basis." *Ali,* 316 F.Supp. at 1250. "Defendants have offered no evidence tending to refute or rebut the overwhelming and undisputed proof of arbitrary, capricious and unfounded discrimination furnished by plaintiff. *Id.* at 1252.

29. "From 1958 until 1979, Thomas worked in the gaming industry." (Plaintiff's Complaint

(No. 1) p. 2). "Between 1974 and 1979, Thomas possessed an ownership interest in gaming properties located in Clark County, Nevada and commonly known as (i) Slots-of-Fun and (ii) Bingo Palace Casino, Inc." *Id.*

30. "Thomas resided in Clark County, Nevada from approximately 1958 until 1985." (Plaintiff's Complaint (No. 1) p. 2). "During his years in the gaming industry, Thomas developed strong friendships with many persons having significant responsibilities and positions in the gaming industry." *Id.*

of the failure to proceed with exclusionary proceedings against the other "defendants" and are insufficient to raise an issue of equal protection of the laws. Moreover, a leader in a criminal endeavor is not similarly situated to subordinates functioning under his direction. *Bell,* 506 F.2d at 221–22. The court finds, from these facts, that a rational basis exists for proceeding against Thomas.

■ Nevada's interest in strict regulation of licensed gaming necessarily includes discretion in selective prosecution. *Glusman,* 98 Nev. at 427, 651 P.2d at 649; *Trans–Sterling v. Bible,* 804 F.2d 525 (9th Cir.1986). Prosecutorial discretion in law enforcement "is by its very nature exceedingly broad." *Washington,* 401 F.2d at 925; *see also United States v. Gainey,* 440 F.2d 290, 291 (D.C.Cir.1971); *Newman v. United States,* 382 F.2d 479, 480 (D.C.Cir. 1967). And "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation," *Oyler,* 368 U.S. at 456, 82 S.Ct. at 506, "but only so when the selection [is] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* This is due in part to both prosecutorial discretion in determining who should be prosecuted and limited resources of law enforcement officials. *Id.* at 454–56, 82 S.Ct. at 504–06; *Snowden v. Hughes,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed.

497; *United States v. Bell,* 506 F.2d 207, 222 (D.C.Cir.1974). The court finds that the same constitutional analysis requiring an unjustifiable standard or other arbitrary classification applies in the context of Nevada's exclusionary proceeding.[31]

Plaintiff provides little evidence of an alleged equal protection violation other than the mere allegation that he was singled out for prosecution, arguing that if he had cooperated he would not have been nominated for placement on the List.[32] Plaintiff's only other "evidence" is an attempt to mirror his past conduct with each of the other people involved in the Tropicana or Argent case who have not been "listed" as evidence of "similarly situated." (Plaintiff's Statement of Facts in Support of Opposition to Defendant's Motion to Dismiss (No. 20A) p. 5).

Because plaintiff's allegation that "others" were not also "listed" can not alone create a claim for an improper or arbitrary selective prosecution and because the Commission and Board have demonstrated a rational basis for the exclusionary proceeding, plaintiff's right to equal protection is not violated. The mere fact that all of the named individuals were allegedly convicted or pled guilty in the same "case", as did plaintiff, does not show that they are "similarly situated" for the purposes of being placed on the List.

---

**31.** In the context of a criminal prosecution, the Ninth Circuit has held that it will not hold "prosecutorial discretion" to be violative of due process unless it is abused to such an extent as to be arbitrary and capricious. *United States v. McClintock,* 748 F.2d 1278, 1283–84 (9th Cir.), *cert. denied,* 474 U.S. 822, 106 S.Ct. 75, 88 L.Ed. 2d 61 (1984). In the instant action, the court holds that a state administrative proceeding is also vested with discretion unless the petitioner shows a clear violation of a recognized fundamental constitutional right.

**32.** Plaintiff also alleges that defendant Jacka, a former Board Chairman, indirectly offered to forego exclusionary proceedings against plaintiff if he would testify and aid the Board in its investigation of Fertitta. (Plaintiff's Complaint (No. 1) p. 6). Plaintiff declined the offer and the Board proceeded. *Id.* Since plea bargaining in the criminal context contains no unconstitutional "element of punishment or retalia-

tion, so long as the accused is free to accept or reject the prosecutions offer," *Bordenkircher v. Hayes,* 434 U.S. 357, 363, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978), the court finds that the Board's alleged offer does not contain a constitutional violation.

Further, plaintiff alleges that Jacka interfered in the Tropicana case sentencing. On January 14, 1986, Jacka, former Board Chairman, sent a letter to Judge Stevens regarding the fact that Thomas refused to cooperate with the Board's investigations into past skimming operations. Exhibit 11(a) pp. 322–26; Exhibit 11(b) pp. 843–44. On March 13, 1986, Judge Stevens reduced Thomas' Tropicana case sentence to two years. Exhibit 11(a) pp. 326–30; Exhibit 11(b) pp. 845–48. Judge Stevens referred to Jacka's letter and recommended to the Parole Commission that it consider, in fixing a release date, the extent of Thomas' willingness to reveal facts to both federal and state authorities. Exhibit 11(a) p. 328; Exhibit 11(b) pp. 846–47.

Further, plaintiff cannot meet his burden under Fed.R.Civ.P. 56(e) and (f), by claiming that if he had been able to discover "the identity of all persons who held a Nevada gaming license or Nevada Gaming work card and who previously had been convicted of a felony," he would be able to prove his case. (Plaintiff's Complaint (No. 1) p. 9).[33] Regardless of plaintiff's unsubstantiated allegations that he is "similarly situated" to the Tropicana and Argent "defendants," plaintiff has not proved the second element of improper motive, irrational selection criteria or deliberate and intentional plan to discriminate against him based upon an unreasonable or arbitrary classification.

Under *Liberty Lobby*, 477 U.S. at 247–48, 106 S.Ct. at 2509–10, 91 L.Ed.2d at 211–12, as to plaintiff's equal protection claim, there are no genuine issues of disputed material fact which require trial on the merit of plaintiff's equal protection claim. The Board focused on plaintiff for the reasons stated by Rumbolz, namely, the seriousness of his crimes, the extent of his participation, his ties with Nevada, and the other matters to which Rumbolz testified. Exhibit 11(b) pp. 957–1010. Defendants have demonstrated that the facts upon which plaintiff's allegations are based are not susceptible to the interpretations plaintiff seeks to give them, *Cities Services*, 391 U.S. at 288, 88 S.Ct. at 1592, that as a matter of law the manner in which plaintiff was selected is rationally related to the purpose of the statute and within the Board's prosecutorial discretion.

Plaintiff was chosen as one who posed a serious threat to the interests of licensed gaming in Nevada. Nev.Rev.Stat. § 463.151 (1987). There was no violation of plaintiff's right to equal protection under the Fourteenth Amendment nor improper use of discretion during the administrative process.

42 U.S.C. § 1985(2):

The court finds that because there was no violation of plaintiff's rights under section 1983, the issues of section 1985(2), declaratory relief and permanent injunction are moot.

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment be GRANTED.

IT IS SO ORDERED.

---

**33.** The Supreme Court has established that statistics alone do not make out a claim for a violation of equal protection due to improper or arbitrary selective prosecution. *Olyer*, 368 U.S. at 456, 82 S.Ct. at 506. "So long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Unit-ed States v. Wayte*, 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985); *Bordenkircher*, 434 U.S. at 364, 98 S.Ct. at 668. The Court further held that this broad discretion is particularly ill-suited for judicial review because the many subtle factors involved "are not readily susceptible to the kind of analysis the courts are competent to undertake." *Wayte*, 470 U.S. at 607, 105 S.Ct. at 1530.